UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>DEMI MARIE GUNVILLE,<br><br>                Defendant. | 3:17-CR-30062-RAL<br><br><br>REPORT AND RECOMMENDATION |

Defendant Demi Marie Gunville is before the court on an indictment charging her with perjury, making a false declaration before a court, and criminal contempt. See Docket No. 1. Ms. Gunville has filed a motion to suppress her statements to tribal law enforcement officers. See Docket No. 24. The United States ("government") resists the motion. See Docket No. 34. This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, United States District Judge.

## FACTS

An evidentiary hearing was held on September 5, 2017. Ms. Gunville was present in person along with her counsel, Christina Klinger. The government was represented by its Assistant United States Attorney, SaraBeth

Donovan. Two witnesses testified and two exhibits were received into evidence. From this testimony and these exhibits, the court makes the following findings of fact.

On January 27, 2017, Ms. Gunville gave sworn testimony in connection with an offer to the federal magistrate judge to act as third-party custodian for her brother, David Gunville. David was then a defendant in a federal drug case. The court released Dave to Ms. Gunville's custody. Thereafter, a report was made that Dave was not living at the location Ms. Gunville had indicated to the court she and her brother would be living. A hearing was held on February 6, 2017, as to that report. Ms. Gunville made certain statements on the record at the February 6 hearing.

The government believed Ms. Gunville had given false sworn testimony on January 27 about the proposed living arrangements for she and David. The government attorney, AUSA SaraBeth Donovan, contacted Jeremy Reede, a Police Sergeant with the Cheyenne River Sioux Tribe Law Enforcement. Ms. Donovan gave Sgt. Reede copies of the transcripts of the January 27, 2017, and February 6, 2017, hearings involving Ms. Gunville. Ms. Donovan asked Sgt. Reede to investigate by interviewing Ms. Gunville and her other brother, Dawson Gunville.[1]

On May 11, 2017, during daylight hours, Sgt. Reede and another Cheyenne River Sioux Tribe law enforcement officer, Cody Norman, went to Ms. Gunville's place of employment, a fitness center in Eagle Butte, South

---

[1] Dawson was a co-third-party custodian along with Demi. Dawson did not appear at either hearing in court, however.

Dakota.  Both officers were dressed in plain clothes consisting of jeans and tee-shirts tucked into their jeans.  Each officer had a service pistol on the exterior of his clothing on his belt.  Each officer also had his badge displayed on the exterior of his clothing.  The firearms and badges were visible.

The officers went to the front desk and asked if Ms. Gunville was working.  Upon learning she was, they asked if they could speak to her.  Ms. Gunville was summoned to the front desk.  Both Sgt. Reede and Officer Norman knew who Ms. Gunville was and had worked out at the fitness center in the past.  Although Ms. Gunville did not testify, presumably she knew at least Sgt. Reede by sight, if not both officers.[2]

Sgt. Reede asked Ms. Gunville if there was a private place they could visit with her.  Ms. Gunville led the officers to a conference room.  She opened the door, ushered the officers into the room, and then closed the door behind them when all three had entered.  The room had an oval table with approximately ten chairs arranged around it.  Ms. Gunville took a seat at the head of the table closest to the door.  Sgt. Reede seated himself to Ms. Gunville's right, approximately the same distance from the door as she.  Officer Norman seated

_____

[2] The court takes judicial notice that Eagle Butte has a population of approximately 1,381 persons and is the tribal headquarters of the Cheyenne River Sioux Tribe.  See www.city-data-com/city/Eagle-Butte-South-Dakota.html, www.sioux.org/government.html, last checked September 6, 2017.  Sgt. Reede testified he has been a tribal police officer for 10 years, has seen Ms. Gunville around town, and he worked out regularly at the fitness center where Demi worked.  Officer Norman has only been a tribal police officer for approximately one year, but testified he saw Ms. Gunville at the fitness center when he was there to work out.

himself to Ms. Gunville's left.  When the officers were seated, their firearms were not visible as they were concealed by the table.

Sgt. Reede explained he was there to talk to Ms. Gunville about her testimony before the federal magistrate judge.  Ms. Gunville asked if she could have her mother present during the interview.  Sgt. Reede explained he would prefer to talk to Ms. Gunville and her mother separately.  Sgt. Reed explained that the interview was voluntary, that Ms. Gunville did not have to speak to the officers if she did not want to.  Ms. Gunville agreed to speak to the officers.  She never mentioned her mother again.  She never asked for an attorney.  She never asked to have anyone else present with her during the interview.  At this point, Sgt. Reede activated a digital handheld audio recording device.  A copy of that audio recording was introduced into evidence.  <u>See</u> Exhibit 1.

Sgt. Reede then proceeded to ask Ms. Gunville questions about the facts and circumstances of the January 27 hearing and the events occurring after that hearing.  Other than perhaps to ask Ms. Gunville for her social security card, Officer Norman did not ask any questions.  During the interview, both Sgt. Reede's and Ms. Gunville's voices were calm, matter-of-fact, and conversational.  Sgt. Reede never raised his voice, cursed, or used any threats.  Sgt. Reede never used any deceptions, never promised anything, and never talked about any consequences, good or bad, that might occur as a result of Ms. Gunville's interview.  Sgt. Reede never pressured Ms. Gunville or used any tricks.  Ms. Gunville's voice on the recording sounds calm, assertive, and precise.

During the interview, Ms. Gunville was not restrained physically in any way.  She was free to move about the room or to leave.  She never asked to have the questioning cease nor did she ask to leave the room or take a break.  The two officers remained seated during the entire interview.

After just under six minutes of questioning, Sgt. Reede told Ms. Gunville he was done asking questions.  At this point, Ms. Gunville asked why Sgt. Reede was asking her all these questions about the court hearing when she had already been questioned in court.  Sgt. Reede turned off his audio recorder.  He answered Ms. Gunville's question in some fashion after the recorder was turned off.  Ms. Gunville asked if she was going to be in trouble and stated she had never been in trouble before.  It is not known whether Sgt. Reede answered Ms. Gunville's question.

At no time were <u>Miranda</u>[3] advisements given by either officer to Ms. Gunville at the time of her statement.  The officers also never told her that she was not under arrest, and would not be arrested on that date.  The officers never told her she could leave the room or stop questioning at any time.  At the time of the interview, Ms. Gunville had no criminal history and was approximately 24 years old.  Sgt. Reede knew Ms. Gunville was the focus of the investigation.  Neither officer communicated this fact to Ms. Gunville.

At the time of the interview, Ms. Gunville never told either officer she suffered from anxiety.  She exhibited no outward signs of anxiety.  Neither officer was aware that Ms. Gunville suffered from anxiety.  Subsequently, at the

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

time Ms. Gunville was arrested, she informed Officer Norman that she suffered from anxiety.

After the interview, Sgt. Reede wrote a report summarizing the interview and emailed the report to Ms. Donovan at the United States' Attorney's Office. See Exhibit 2. He mistakenly wrote in his report that the interview occurred on May 10 instead of May 11, 2017. Id. Also, he did not include in his written report the fact that he advised Ms. Gunville prior to the interview that her participation was voluntary. Id. At Ms. Donovan's request via telephone, Sgt. Reede wrote an addendum to his original report correcting the date of the interview as stated in the report and including the fact he had given a voluntariness advisement. Id.

The indictment in this case was issued May 16, 2017, five days after Ms. Gunville's interview took place. See Docket No. 1. Ms. Gunville was arrested on May 17, 2017, and had an initial appearance before this court on May 18. See Docket Nos. 11 & 16.

Ms. Gunville now moves to suppress the statement she made to Sgt. Reede and Officer Norman on May 11. She asserts two grounds. First, that she was subjected to custodial interrogation and was not advised of her Miranda rights. Second, that her statement was involuntary. The government counters by asserting Ms. Gunville was not in custody so Miranda warnings were not required and that her statement was voluntary.

## DISCUSSION

**A.      Whether Ms. Gunville Was in Custody**

The holding of the <u>Miranda</u> case "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)).  A <u>Miranda</u> warning is required prior to questioning whenever two conditions are present:  (1) the suspect is being interrogated and (2) the suspect is in custody.  <u>Unites States v. Flores-Sandoval</u>, 474 F.3d 1142, 1146 (8th Cir. 2007); <u>Griffin</u>, 922 F.2d at 1347; <u>United States v. Carter</u>, 884 F.2d 368, 371 (8th Cir. 1989).

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.  <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).  Here, neither party disputes that Ms. Gunville was being interrogated and neither party disputes that <u>Miranda</u> warnings were not given prior to the questioning in this case.  Thus, whether Ms. Gunville's statements should be suppressed pursuant to the rule in <u>Miranda</u> depends on whether Ms. Gunville was in custody at the time of her interrogation.

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government.  <u>See</u> <u>United States v. Charbonneau</u>, 979 F. Supp. 1177 (S.D. Ohio 1997).  Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a

voluntary waiver only after the defendant has sustained his initial burden.  See United States v. Moore, 104 F.3d 377, 391 (D.C. Cir. 1997).  The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have.  See e.g. United States v. Morriss, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority).  For purposes of this report and recommendation, the court has placed the burden of proving that Ms. Gunville was *not* in custody on the government.

A suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in any significant way."  Griffin, 922 F.2d at 1347 (citing Berkemer v. McCarty, 468 U.S. 420, 429 (1984)).  Absent formal arrest, a suspect is deemed is be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest."  Berkemer, 468 U.S. at 442; United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.  The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator.  Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.  In determining whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances.  Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)).

8

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency:  (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation.  See Flores-Sandoval, 474 F.3d at 1146-1147 (citing Griffin, 922 F.2d at 1349).

Reference to these factors is helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly."  Flores-Sandoval, 474 F.3d at 1147.  In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered.  Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370.

In United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), the Eighth Circuit cautioned the Griffin factors are by no means exhaustive and should not be applied "ritualistically."  The Court emphasized "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody.  Id. at 826.  The Eighth Circuit regards the twin

admonitions that the suspect is free to leave and does not have to answer questions to be "weighty in the custody analysis." United States v. Perrin, 659 F.3d 718, 720-21 (8th Cir. 2011). The Griffin factors still appear in Eighth Circuit case law after Czichray, and continue to be cited with approval for determining the custody issue. See id.

Whether a suspect was the focus of an investigation at the time the interrogation takes place is of little significance unless that fact was communicated to the suspect and that fact contributed to the suspect's reasonable conclusion of not being free to go. Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370 (citing United States v. Jimenez, 602 F.2d 139, 145 (7th Cir. 1979)).

Courts have given substantial weight to an interrogator's advising a suspect that no arrest is being made or will be made at the time of questioning, and that the suspect is free to decline to answer questions or to terminate the interrogation at any point the suspect so chooses. Perrin, 659 F.3d at 720-21; Griffin, 922 F.2d at 1349-1350.

The court in United States v. Johnson, 64 F.3d 1120, 1125-1126 (8th Cir. 1995), found that the suspect was not in custody even though he was questioned in the back of a patrol vehicle. Specific factors which led the court to its conclusion were that the suspects were specifically advised that they were not under arrest, they were not handcuffed or otherwise restrained while in the squad car, they were not isolated, their passengers remained at the scene, no

strong arm tactics were employed, the questioning was straightforward, and the officer who questioned the suspects was not in uniform.

The Carter case, like this one, involved a workplace interrogation. Carter was a mailroom employee at a Sioux Falls bank. Carter, 884 F.2d at 369. Postal inspectors went to the bank and Carter was summoned to the bank president's office at approximately 4 p.m. Id. Inside the office were Carter, the postal inspectors, and the bank security manager. Id. The inspectors interrogated Carter for approximately 90 minutes. Id. After 55 minutes, the inspectors asked to look in Carter's wallet, where they found evidence, the incriminating nature of which was explained to Carter. Id. Only after obtaining incriminating statements from Carter did the inspectors advise Carter of his Miranda rights. Id. They then had Carter handwrite out a reiteration of his earlier incriminating statements. Id. Carter was not arrested and was allowed to go home. Id.

In rejecting the government's blanket suggestion that workplace interrogations are always noncustodial, the court reviewed several other cases involving workplace interrogations. Id. at 371. In one case where the suspect was determined not to be in custody, the police had told her she did not have to answer any questions, she was free to go, she was not under arrest, and she was not going to be arrested that day. Id. (discussing United States v. Dockery, 736 F.2d 1232, 1233-34 (8th Cir. 1984) (*en banc*)).

In another case the suspect was not in custody in the workplace where he was the subject of two very brief interviews, he made and received telephone

calls and spoke to other employees during the interviews, and even left one interview for a period of time.  Id. (discussing United States v. Venerable, 807 F.2d 745, 747 (8th Cir. 1986)).  In yet a third case, the court held the suspect was not in custody where a federal agent questioned the man in his own office, merely asked a few non-threatening questions, and made no attempt to restrict the suspect's freedom of movement.  Id. (discussing United States v. Rorex, 737 F.2d 753, 756 (8th Cir. 1984)).

In the facts of the Carter case, in contrast, the totality of the facts were distinguishable from these cases.  Carter, a low-level employee, was not questioned in the comfortable surroundings of his own work station.  Id. at 371-72.  Instead, he was summoned to the bank president's office and made to sit between two inspectors; he faced the president's desk, behind which the bank security manager was seated.  Id.  He was isolated from others who might have given him moral support.  Id.  When he offered to take the inspectors to his work area to show them something, they replied, "no, just stay here."  Id. at 372.  He was never told he was free to leave or that he did not have to answer questions.  Id.  This was Carter's first experience being questioned by law enforcement.  Id.  The inspectors used the "good cop-bad cop" routine.  Id.  He was questioned for over an hour before being confronted with damning evidence of his guilt.  Id.  The court held Carter had been in custody at the time of his interrogation and that Miranda warnings should have been given.  Id.

Last year the Eighth Circuit held a suspect was not in custody in a workplace interview where the suspect's supervisor passed him a note to come

see him, when the suspect responded he was escorted to a conference room in the human resources area, the interview took place with two officers in plain clothes, the officers told the suspect at the beginning that the interview would be short so he could return to work, the interview lasted only 20 minutes, the officers told the suspect he was not under arrest, and the suspect was not arrested at the end of the interview. United States v. Laurita, 821 F.3d 1020, 1025-27 (8th Cir. 2016). The suspect had an associate's degree, held a professional job, was in his thirties, and had prior experience being interviewed by police. Id.

In United States v. Wallace, 323 F.3d 1109, 1110-11 (8th Cir. 2003), nine plain-clothes officers entered an office and ordered all 17 employees to back away from their desks. Police interviewed all 17 employees. Id. Wallace, the office manager, was interviewed by one police officer in the employee lounge where there were a couch, television, chairs and a bathroom. Id. Police did not tell Wallace she was free to leave, free to decline the interview, or that she was not under arrest. Id. She was questioned for approximately 10-15 minutes from a preprinted questionnaire that was used to interrogate all the employees. Id. No strong-arm tactics or deceptive stratagems were used and Wallace was not arrested. Id. at 1113. The court held Wallace, who was not the target of the investigation, was not in custody under these circumstances. Id.

As can be seen, then, the location of the interrogation is relevant, but not determinative. A suspect may be in custody in his own home, Griffin, 922 F.2d at 1346, 1356, and may *not* be in custody while being questioned at the police

department, United States v. LeBrun, 363 F.3d 715, 720-21 (8th Cir. 2004), or in the back of a patrol car, Johnson, 64 F.3d at 1125-1126. Careful evaluation of the totality of circumstances is necessary.

Here, the court has no trouble concluding Ms. Gunville was *not* in custody. Sgt. Reede told Ms. Gunville the interview was voluntary and she did not have to talk to the officers. The Eighth Circuit regards this as a "weighty" factor in the analysis. Perrin, 659 F.3d at 720-21. The other "weighty" factor is for the officer to tell the suspect outright that they are not under arrest. Czichray, 378 F.3d at 826. Sgt. Reede failed to advise Ms. Gunville of this fact. Nevertheless, the remaining factors favor a conclusion that she was not in custody.

Ms. Gunville had absolute freedom of movement in the interview. She herself opened and closed the door to the room. She herself selected her seat at the head of the table. Although it was police who initiated contact with Ms. Gunville, the atmosphere was not police-dominated. There were no tricks, pressures, coercion, or strong-arm tactics. Both the officers and Ms. Gunville were calm, cool, and casual during the interview. Officer Norman never asked any questions at all. Although the interview took place at work, the interview was not in Ms. Gunville's supervisor's office nor was her supervisor or any other workplace authority-figure present. The interview was only six minutes long. The officers never told Ms. Gunville she was the focus of the interview, but after being scolded in court by the judge on February 6, this was obviously something she knew or could infer.

14

Ms. Gunville did request her mother to be present, a request that was not denied outright, but Sgt. Reede made his preference known. Ms. Gunville chose to go forward with the interview without requesting the presence of any other third party or an attorney.

In order to conclude Ms. Gunville was "in custody," her freedom must have been curtailed to a degree associated with formal arrest. <u>Berkemer</u>, 468 U.S. at 442. Examining the totality of circumstances, the court concludes no reasonable person in Ms. Gunville's position would have concluded they were in custody.

Ms. Gunville appears to argue that her anxiety condition, youth and lack of experience with the criminal justice system made her uniquely susceptible to police pressure. But there is no evidence the police knew she suffered from an anxiety condition at the time of the interview. The officers had no prior knowledge of any such condition (if one in fact exists—no evidence was introduced), and Ms. Gunville never exhibited any outward signs of anxiety. They obviously knew of her youth and lack of criminal record, but their interview was cordial and did not exploit these qualities. The court recommends denying Ms. Gunville's motion to suppress based on <u>Miranda</u> as she was not in custody at the time of her interview.

**B.**     **Whether Ms. Gunville's Statement was Voluntary**

Ms. Gunville also moves to suppress her statement on the grounds it was involuntary. The Supreme Court has stated that, under the Due Process Clause of the Fifth and Fourteenth Amendments, "certain interrogation

techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." Miller v. Fenton, 474 U.S. 104, 109 (1985) (citing Brown v. Mississippi, 297 U.S. 278 (1936)). "In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998) (citing Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (citing Culombe v. Connecticut, 367 U.S. 568, 602 (1961))).

The court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." Id. See also Withrow v. Williams, 507 U.S. 680, 688–89 (1993) (continuing to adhere to the totality of circumstances test). See Dickerson v. United States, 530 U.S. 428, 434 (2000) ("The due process test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' "). The burden of demonstrating that a defendant's statement was voluntary rests with the government, which must prove voluntariness by at least a preponderance of the evidence. Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004).

The Supreme Court has made clear that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the

meaning of the Due Process Clause of the [Fifth or] Fourteenth Amendment."[4]

Colorado v. Connelly, 479 U.S. 157, 167 (1986). That is because a *prima facie* showing of a due process violation must include a showing of some sort of *state action.* Connelly, 479 U.S. at 165–66. Therefore, a defendant's mental status alone can never result in a finding that his statement was involuntary without some form of police overreaching. Id.

However, this does not mean that a defendant's mental status is irrelevant to the question of whether his statement was voluntary. A defendant's mental status is still relevant under the totality of circumstances test to the extent the evidence shows that the police were aware of that mental status and acted in some way to exploit it. See United States v. Makes Room For Them, 49 F.3d 410, 415 (8th Cir. 1995) (holding that totality of circumstances requires consideration of defendant's age, education, and experience insofar as police knew those facts); Townsend v. Sain, 372 U.S. 293, 298–99 (1963) (defendant's statement was involuntary when obtained following the police's administration of a truth serum to defendant), overruled on other grounds Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992);[5] (defendant's statement was involuntary when obtained following the police's administration of a truth serum to defendant); Blackburn v. Alabama, 361 U.S. 199, 207–08 (1960)

---

[4] "Although Connelly arose under the Due Process Clause of the Fourteenth Amendment, whereas the instant case appears to implicate the Fifth Amendment, the analysis in the Connelly decision has been extended to apply to involuntary confession claims arising under the Fifth Amendment as well." United States v. Bad Hand, 926 F. Supp. 891, 899 n.10 (D.S.D. 1996).

[5] Keeney was in turn superseded by statute. See Williams v. Taylor, 529 U.S. 420, 432–33 (2000) (discussing the enactment of 28 U.S.C. § 2254).

(defendant's statement was involuntary where police were aware of defendant's history of mental problems, knew that he was probably insane, and proceeded with interrogation).

Where a defendant suffered from some mental infirmity and police were unaware of that infirmity, courts have found the necessary state action to be missing. Connelly, 479 U.S. at 160–61, 164–65 (confession not coerced where defendant exhibited no sign of mental illness to police, but where defendant in fact confessed because "voices" commanded him to confess); see also United States v. Rohrbach, 813 F.2d 142, 144–45 (8th Cir. 1987) (confession was voluntary despite defendant's minimal formal education, history of drug and alcohol abuse, and suicide attempts where there was no corresponding coercive actions on the part of police).

The existing precedent shows the type of police conduct that courts have found to be coercive. The conduct includes extreme duration and conditions of detention, the manifest attitude of police toward the defendant, pressures which sap or sustain a defendant's powers of resistance or self-control, and exploiting a defendant's mental and physical state. See Colorado v. Spring, 479 U.S. 564, 574 (1987) (quoting Culombe, 367 U.S. at 602 (opinion of Frankfurter, J.)); Davis v. North Carolina, 384 U.S. 737, 739–53 (1966) (defendant held for sixteen days of incommunicado interrogation in a closed cell without windows); Blackburn, 361 U.S. at 207–08 (defendant was probably insane at the time of his confession, police knew defendant had a history of mental problems, police questioned defendant for eight to nine hours of

sustained interrogation in a tiny room literally filled with police, police isolated defendant from friends, relatives, or legal counsel); Reck v. Pate, 367 U.S. 433, 436–44 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); Culombe, 367 U.S. at 625–26 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); Payne v. Arkansas, 356 U.S. 560, 561–68 (1958) (defendant held incommunicado for three days with little food and threats that a lynch mob would be admitted into the jail); Ashcraft v. Tennessee, 322 U.S. 143, 153–55 (1944) (defendant questioned by relays of officers for 36 hours without sleep). It is this body of law which the court applies to Ms. Gunville's assertion that her statement was involuntary.

Based on the legal analysis of Connelly and its progeny, the court considers all the facts and circumstances surrounding Ms. Gunville's statement in determining whether that statement was voluntary. See Withrow v. Williams, 507 U.S. 680, 688–89 (1993); Arizona v. Fulminante, 499 U.S. 279, 285–86 (1991); Miller v. Fenton, 474 U.S. 104, 109–10 (1985); and United States v. Plumman, 409 F.3d 919, 925 (8th Cir. 2005) (holding that "recap" statement was voluntary when two FBI agents used "rapport building" technique to interview suspect). In this context, the court also considers Ms. Gunville's personal characteristics to the extent they were known to the agents. Blackburn v. Alabama, 361 U.S. 199, 207–08 (1960); United States v. Makes Room For Them, 49 F.3d 410, 415 (1995); Jenner v. Smith, 982 F.2d

329, 333 (8th Cir. 1993).  The court concludes that Ms. Gunville's May 11, 2017, statement was voluntary.

The analysis is similar to the "in custody" analysis.  The court must evaluate the totality of the circumstances.  Plumman, 409 F.3d at 925. Furthermore, there must be some form of police overreaching in order for a due process violation to have occurred.  Connelly, 479 U.S. at 160-61.  Here, although Ms. Gunville's counsel asserts she suffers from an anxiety condition, no evidence of that condition was apparent to the officers when they interviewed her and the officers had no independent knowledge of such a condition.  Ms. Gunville was young, but not of tender years like a teenager or preteen.  And she had no experience with the criminal justice system.  But again, the interview contained no pressure, tactics, lies, or coercion of any kind.  Furthermore, the interview was conducted in surroundings familiar to Ms. Gunville and it was short in the extreme—only six minutes.  The officers could have and should have advised Ms. Gunville that she was not under arrest.  Perrin, 659 F.3d at 720-21.  They did, however, advise her that her participation in the interview was voluntary and that she did not have to talk to the officers.  Under all these circumstances, the court concludes Ms. Gunville's statement was voluntary and not the product of her free will being overborne by police.  Accordingly, the court recommends her motion to suppress her statement on the grounds of involuntariness be denied.

## CONCLUSION

Based on the foregoing law, facts and analysis, this magistrate judge respectfully recommends that defendant Demi Marie Gunville's motion to suppress her statement [Docket No. 24] be denied in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED September 8, 2017.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge