UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION



FILED
OCT 11 2017

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DEMI MARIE GUNVILLE,<br><br>Defendant. | 3:17-CR-30062-RAL<br><br>OPINION AND ORDER ADOPTING<br>REPORT AND RECOMMENDATION |

Defendant Demi Gunville (Demi) agreed to be a third-party custodian for her brother Dave Gunville (Dave). At Dave's bail review hearing, Demi gave sworn testimony about where she and Dave would live when he was out on bail. Shortly after Dave was released, a federal probation officer filed a Report of Apparent Violation of Pretrial Release Conditions alleging that Dave was not living where he was supposed to. During a February 6, 2017 hearing on this Report, Judge Moreno told Demi that she could potentially face criminal sanctions if she had lied about where Dave would be living while out on bail. Judge Moreno also informed Demi that the government would decide whether to bring charges against her.

Believing that Demi had given false sworn testimony during the bail review hearing, the government asked the Cheyenne River Sioux Tribe Police Department to investigate. Sergeant Jeremy Reede and Officer Cody Norman interviewed Demi at the fitness center in Eagle Butte, South Dakota, where she works. Less than a week later, a grand jury indicted Demi for perjury, false declaration before a court, and criminal contempt. Demi moved to suppress her statements

1

from the interview, arguing that they were involuntary and that the officers violated Miranda v. Arizona, 384 U.S. 436 (1966), by questioning her without first advising her of her rights. Magistrate Judge Veronica L. Duffy conducted an evidentiary hearing and then recommended denying Demi's motion. Demi has now objected to that recommendation.

This Court reviews a report and recommendation under the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Having conducted a de novo review, this Court adopts the report and recommendation in full.

I. Discussion

  A. Miranda Challenge

Demi argues that her statements to Sergeant Reede and Officer Norman should be suppressed because she never received Miranda warnings. Miranda requires police officers to give a suspect certain warnings before interrogating him but only when the suspect is in custody. J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011); Miranda, 384 U.S. at 444. Judge Duffy concluded that Demi's statements are admissible under Miranda because Demi was not in custody when she made them. Demi objects to this conclusion, arguing that it is based on erroneous factual and legal findings. This Court addresses Demi's factual arguments first.

Sergeant Reede and Officer Norman arrived at the fitness center during daylight hours on May 11, 2017. T. 44. They were wearing plain clothes but their badges and service weapons were visible. T. 11–12, 65–66. The officers asked for Demi at the front desk and one of her coworkers brought her to meet them. T. 9, 61. At that time, Demi was approximately twenty-four years old and had no criminal history. T. 37. Sergeant Reede asked Demi if she would

speak with him and Demi agreed. T. 9, 61–62. Rather than interviewing Demi in the fitness center lobby, Officer Reede inquired whether there was somewhere private they could talk. T. 9–10, 44. Demi then led the officers to a conference room located beside the workout area; the room had an oval table surrounded by ten chairs. T. 9–10, 43–44, 62, 69. As they entered the room, Sergeant Reede told Demi that the interview was voluntary and that she did not have to speak with the officers if she did not want to do so. T. 9–10, 20, 44–45, 64. Demi asked if her mother could be present during the interview, but Sergeant Reede said he would prefer to speak with her mother separately. T. 9–10, 64. Demi closed the door to the conference room and everyone took a seat. T. 10, 62. Demi sat at the head of the table closest to the door while Sergeant Reede sat to her right and Officer Norman sat to her left. T. 10–11, 14, 62–63. Demi was not restrained in any way and she had an unobstructed path to the door. T. 14, 63–64, 69.

Once everyone was seated, Sergeant Reede activated a digital recording device and began the interview. T. 10–11. He asked Demi about the circumstances surrounding the bail review hearing and what occurred thereafter. Ex. 1. Approximately five-and-a-half minutes into the interview, Sergeant Reede informed Demi that he had covered everything he needed to know. Ex. 1 at 05:14–05:20. Demi then asked Sergeant Reede why he was asking her these questions when she had already answered them in court. Ex. 1 at 05:20–05:24. Sergeant Reede said that he was concluding the interview and turned off his recording device. Ex. 1. He then responded to Demi in some manner, and Demi asked whether she was going to be in trouble. T. 35–36. The record does not show whether Sergeant Reede answered Demi's question.

The interview lasted approximately six minutes. Ex. 1; T. 16. The officers never told Demi she was under arrest and did not arrest her at the end of the interview. T. 13; 68. The tone of the interview was conversational; Sergeant Reede never raised his voice and Demi responded

3

appropriately in a calm, clear manner. Ex. 1; T. 14–15, 79. The officers testified that Demi seemed comfortable speaking with them but that she appeared to be nervous at the end of the interview when she asked why she was being questioned. T. 14, 16, 33, 47–48, 67.

Demi objects to several of Judge Duffy's factual findings, the main objection being that Sergeant Reede never told Demi that the interview was voluntary and that she did not have to speak to the officers. Demi argues that the evidence does not support this finding because the discussion is not on the recording of the interview and because Sergeant Reede failed to mention the discussion in his original report. Sergeant Reede testified that the voluntariness discussion occurred before everyone sat down and he started his digital recorder. T. 19–20. He also said that although his original report on the interview did not mention the voluntariness discussion, he wrote an addendum after an assistant United States attorney told him that any warnings he gave a suspect needed to be included in his reports. T. 19–20, 51. The addendum states that Sergeant Reede told Demi that the interview was voluntary and that she did not have to speak with the officers. Ex. 2. At the suppression hearing, Sergeant Reede and Officer Norman both testified that Sergeant Reede told Demi that the interview was voluntary and that she did not have to speak with the officers if she didn't want to. T. 9–10, 20, 44–45, 64. Judge Duffy observed this testimony and evidently found it credible. That the voluntariness discussion was not part of the recording or the original report does not justify rejecting Judge Duffy's credibility finding.

Demi's next objection is that Judge Duffy erred by finding that the officers' firearms were not visible during the interview because they were concealed by the table. Sergeant Reede testified that when he was seated at the table in the conference room, his firearm was on his right hip, which was the hip farthest away from Demi, and that the firearm was "basically under the table." T. 12. Officer Norman testified that he angled his seat at the conference room table

4

towards Demi so that his firearm, which was on his right hip, was facing away from her. T. 66. Regardless of whether the officers' firearms were visible during the interview, it is clear that Demi would have seen the firearms when she met the officers in the lobby. The presence of the firearms is a factor this Court will consider when analyzing the issues of custody and voluntariness.

Demi also objects to Judge Duffy's finding that Sergeant Reede told Demi that he would prefer to speak to Demi and her mother separately. Demi argues that Judge Duffy should have found that Sergeant Reede "denied" Demi's request to have her mother present during the interview. The only evidence on this issue supports Judge Duffy's finding. Sergeant Reede and Officer Norman both testified that when Demi asked if her mother could be present during the interview, Sergeant Reede said he would rather interview Demi and her mother separately. T. 9–10, 64. Instead of insisting that her mother or anyone else be present, Demi sat down at the table and answered Sergeant Reede's questions. T. 47, 64–65.

Demi's fourth objection is that Judge Duffy erred by finding that Demi's voice on the recording of the interview sounded calm, assertive, and precise. Demi asserts that the recording shows that she "was unaware of certain facts" and that she seemed to be "talking through her feelings and thoughts out loud." Doc. 42 at 3. This Court has listened to the interview multiple times and agrees with Judge Duffy that Demi sounded calm, assertive, and precise.

Demi also objects to Judge Duffy's finding that Sergeant Reede told Demi why he wanted to talk to her before he turned on his recording device. Sergeant Reede testified that he informed Demi of the reason for the interview after everyone entered the conference room. T. 28. Officer Norman testified that Demi was not told of the reason for the interview before Sergeant Reede turned the recording device on. T. 75. Regardless of what Sergeant Reede told

5

Demi before turning the recording device on, the purpose of the interview was clear to Demi; the first question Sergeant Reede asked concerned the third party hearing. Ex. 1 at 00:00–00:25.

Demi's remaining factual objections are either irrelevant, constitute legal arguments, or are addressed by this Court's factual findings. Having dealt with Demi's factual objections, this Court turns to whether Demi was in custody during the interview.

The "ultimate inquiry" in the custody determination is "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (alteration in original) (internal quotation marks omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)). To answer this inquiry, courts consider whether, given all of the circumstances surrounding the interrogation, a reasonable person would have felt at liberty to terminate the interrogation and leave. J.D.B., 564 U.S. at 270; see also Howes v. Fields, 565 U.S. 499, 509 (2012) (listing factors relevant to custody determination); United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990) (identifying six non-exclusive factors for determining whether a suspect is in custody). Because the custody determination focuses on how a reasonable person in the suspect's position would have felt, the "'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant." J.D.B., 564 U.S. at 271 (quoting Stansbury, 511 U.S. at 323).

The circumstances of the interview reveal that Demi was not in custody. Sergeant Reede informed Demi that the interview was voluntary and that she was not required to speak with the officers if she didn't want to. The advice an officer provides about the interview is highly probative of whether a reasonable person in the suspect's position would have felt free to end the interview and leave. United States v. Czichary, 378 F.3d 822, 826 (8th Cir. 2004). Advice like

6

the kind Sergeant Reede gave here—that the interview was voluntary and that Demi didn't have to speak with the officers—militates strongly against finding that Demi was in custody. United States v. Sanchez, 676 F.3d 627, 631 (8th Cir. 2012) (explaining that "when officers clearly inform a suspect that she is free to leave or decline questioning[,]" such advice "weighs heavily in favor of noncustody"). Demi argues that a reasonable person in her position would not have felt free to terminate the interview and leave because the officers never told her she was not under arrest or that she could leave the conference room at any time. True, advising a suspect that she is not under arrest or that she is free to leave militates against finding that the suspect was in custody, and ideally the officers should make that clear during a noncustodial interview. Griffin, 922 F.2d at 1349. But here, the officers' failure to give such advice did little to make the interview seem more custodial in nature; Sergeant Reede told Demi the interview was voluntary as they entered the conference room and nothing about the officers' other actions suggested that Demi had to answer questions or was required to stay in the room. Cf. United States v. Laurita, 821 F.3d 1020, 1024 (8th Cir. 2016) (explaining that "a suspect not being told he is free to leave during police questioning" is not necessarily "a strong indication he was in custody").

Beyond the advice Sergeant Reede gave Demi, other facts suggest that the interview was noncustodial. First, the interview was not police dominated. The interview occurred at Demi's workplace, "a location familiar to [Demi] and a place where she would be comfortable and less threatened." United States v. Wallace, 323 F.3d 1109, 1113 (8th Cir. 2003) (concluding that an interview that occurred at the suspect's workplace was not police dominated). The officers did not take control of Demi's workplace but rather followed her to the conference room after asking if there was somewhere private they could talk. Demi chose to close the door to the conference room and where she sat at the table. The interview lasted only six minutes and was conducted by

7

two officers, one of whom didn't ask any questions. Although the officers' service weapons may have been visible during the interview, the officers never brandished their weapons or even removed them from their holsters. See United States v. Galceran, 301 F.3d 927, 929, 930–31 (8th Cir. 2002) (per curiam) (holding that a ninety minute interview in a windowless conference room by two officers who had their weapons with them was not police dominated).

Second, Demi's freedom of movement was not restrained during the interview. She had an unobstructed path to the door that she herself had closed, she chose where she wanted to sit, the officers never physically or verbally restrained her, and she never asked to leave or move around during the very brief interview. The Eighth Circuit has found that a suspect interviewed under similar circumstances "possessed unrestrained freedom of movement." Laurita, 821 F.3d at 1025 (quoting Griffin, 922 F.2d at 1349) (finding that the suspect's freedom of movement was unrestrained where the officer did not physically or verbally restrain the suspect, the suspect had a clear path to a closed door, the suspect never asked to leave the room or move around, and the interview was brief, lasting only twenty minutes); see also United States v. Crossley, 224 F.3d 847, 862 (6th Cir. 2000) (finding that the suspect had "complete freedom of movement" where the agents never told the suspect she couldn't leave the room and never physically restrained her, the suspect never asked or attempted to leave the room, and the suspect was sitting close to an unlocked door), superseded by statute on other grounds as recognized in United States v. Rogers, 769 F.3d 372, 381 (6th Cir. 2014).

Third, the officers never used any strong-arm tactics or tricks during the interview. Ex. 1; T. 15, 79. Although Demi argues that the officers were deceptive because they never told her they were conducting the interview to gather evidence against her, this sort of "deception" is not relevant to the custody analysis because it would not have stopped a reasonable person from

8

terminating the interview and leaving. United States v. Ollie, 442 F.3d 1135, 1138–39 (8th Cir. 2006) (holding that a police officer's lie that the suspect's fingerprints had been found on a gun was not relevant to the custody determination); see also Griffin, 922 F.2d at 1348 ("It is insufficient to render an interrogation custodial that the purpose of the interrogation is to obtain potentially inculpatory information from a suspect that has become the focus of the investigation."). If anything, the officers informing Demi that they were investigating her so that charges could be brought would have made the interview seem more custodial.

Finally, the officers did not arrest Demi at the end of the interview. "Lack of arrest is a 'very important' factor weighing against custody." Galceran, 301 F.3d at 931 (quoting United States v. Sutera, 933 F.2d 641, 647 (8th Cir. 1991)).

Against these facts, Demi argues that she was in custody given Sergeant Reede's statement that he would prefer to interview her separately from her mother; Sergeant Reede asking whether there was somewhere private they could talk; and what occurred during the February 6, 2017 hearing before Judge Moreno. As to Demi's first two points, isolating a suspect from family, friends, or colleagues can contribute to the custodial nature of an interview. Howes, 565 U.S. at 512–13; Griffin, 922 F.2d at 1352. But a reasonable person would not view Sergeant Reede's request to speak with Demi in private and preference for interviewing Demi's mother separately as a restriction on movement akin to a formal arrest. Other people were in the lobby when the officers met Demi there. T. 28, 44. Sergeant Reede testified that he asked to speak with Demi in private because the lobby was not conducive to conducting an interview and he did not think other people needed to hear what the parties were discussing. T. 28, 44. The officers did not take control of the fitness center or direct Demi to a particular area, but rather allowed Demi to choose the location of the interview. T. 9–10, 43–44, 62, 78–79. The officers

9

also told Demi the interview was voluntary and that she didn't have to answer questions. Under these circumstances, a reasonable person would understand that Sergeant Reede's request to speak with her in private was not a coercive tactic to limit her freedom to leave. And while having Demi's mother present during the interview might have made Demi feel more comfortable and less restricted, Sergeant Reede's statement that he preferred to speak with her mother separately did not make the interview custodial. The interview occurred in the location Demi chose, the conference room beside the workout area. It was Demi, rather than the officers, who closed the door to this room. There is no evidence that the officers isolated Demi by preventing her from contacting others or stopping someone from entering the room. Cf. United States v. Kim, 292 F.3d 969, 971, 975, 978 (9th Cir. 2002) (finding that a suspect was in custody where officers let her into her store but locked her husband out, directed her where to sit, told her to "shut up," never told her she could leave, and isolated her from her son who was also in the store). If Demi did not want to participate in the interview without her mother, a reasonable person in her position would have felt free to simply forego the interview altogether.

Demi's argument that she was in custody because of what occurred during the February 6, 2017 hearing fares no better. To be sure, a suspect may feel less freedom to terminate an interview if he knows the police have evidence of his guilt and have focused on him. See Stansbury, 511 U.S. at 325 (explaining that an officer's beliefs "concerning the potential culpability of" a suspect is relevant to the custody determination if the suspect is aware of these beliefs); Griffin, 922 F.2d at 1348 ("[T]he fact that the individual has become the focus of the investigation is relevant 'to the extent that the suspect is aware of the evidence against him' and this awareness contributes to the suspect's sense of custody." (quoting United States v. Carter, 884 F.2d 368, 370 (8th Cir. 1989))). And as Judge Duffy found, although the officers never told

10

Demi she was the focus of their investigation, Demi could have inferred this fact from Judge Moreno's comments at the February 6, 2017 hearing. Nevertheless, any coercion Demi felt from being the focus of an investigation was offset by all of the factors suggesting that she was free to terminate the interview and leave.

Demi contends that her case is similar to Carter, 884 F.2d 368, but that case is easily distinguishable. In Carter, the Eighth Circuit found that a bank employee was in custody when he was interviewed at work. Id. at 372. The employee was summoned to the bank president's office where, in the presence of the bank's security manager, two postal inspectors interviewed him for approximately ninety minutes. Id. at 369. The inspectors never told the employee he was free to leave or that he did not have to answer questions, said "no, just stay here" when the employee offered to show them his work equipment, confronted the employee with "damning evidence of guilt," and used the good-cop, bad-cop routine. Id. at 372. In contrast, the officers here told Demi that the interview was voluntary and that she did not have to answer any questions, did not engage in any strong-arm tactics or deception, never verbally restrained her, did not confront her with evidence of her guilt, allowed Demi to choose where the interview would occur, and only interviewed her for six minutes. Moreover, none of Demi's work supervisors were present during the interview.

The Carter case, along with at least two other appellate cases, illustrates just how far Demi's interview is from qualifying as custodial. In Laurita, 821 F.3d 1020, for instance, the Eighth Circuit held that a suspect interviewed at work was not in custody even though the suspect's supervisor had escorted him to a conference room to meet with an FBI agent and an FBI computer specialist, the agent closed the door to the conference room, and the agent never told the suspect he was free to leave or that the interview was voluntary. Id. at 1022, 1024, 1027,

11

1028. Similarly, the Ninth Circuit held that a workplace interview was not custodial even though a detective had instructed the suspect to go to a conference room, the police closed the door to the room, a detective told the suspect that he was not under arrest and would "walk out of here when we're done" but never told the suspect he was free to leave or that the interview was voluntary, and the interview lasted nearly two-and-a-half hours. United States v. Bassignani, 575 F.3d 879, 881, 884, 886–887 (9th Cir. 2009). If the suspects in Laurita and Bassignani were not in custody, neither was Demi.

In sum, Demi's interview was not custodial given its location, atmosphere, and brevity, the absence of any strong-arm tactics or restraint on Demi's freedom of movement, the officers' advisement that the interview was voluntary and that Demi did not need to answer any questions, and the officers' decision not to arrest Demi at the end of the interview.

**B.     Voluntariness**

Demi also argues that Judge Duffy should have found that her statements were involuntary under the Fifth Amendment. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc) (quoting Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001)); see also Schneckloth v. Bustamonte, 412 U.S. 218, 226–27 (1973). In determining whether a statement was involuntary, both the conduct of the police and the personal characteristics of the defendant must be considered. See Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004) ("We consider, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical

condition, and mental condition."); LeBrun, 363 F.3d at 724; United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998).

Although Demi is fairly young and had no experience with law enforcement, the record establishes that the officers did not overbear her will. Demi responded to the officers in a calm, clear manner and felt comfortable enough to ask the officers why they were questioning her when she had already answered the same questions at the February 6, 2017 hearing. Ex. 1. The interview occurred at a familiar location and was very brief, and Demi was told that it was voluntary and that she did not have to answer questions. There is no evidence that Demi was under the influence of drugs or alcohol. Although the officers said Demi appeared nervous after Sergeant Reede indicated the interview was over, nothing suggests that Demi was experiencing the type of physical or mental distress that would make her particularly susceptible to interrogation. The officers never made any threats or promises, raised their voices, brandished their weapons, or used force against Demi. Demi's statements were voluntary.

**II.  Conclusion**

For the reasons stated above, it is hereby

ORDERED that Defendant's Objections to the Report and Recommendation, Doc. 42, are denied. It is further

ORDERED that the Report and Recommendation, Doc. 41, is adopted. It is finally

ORDERED that Defendant's Motion to Suppress, Doc. 24, is denied.

DATED this 11th day of October, 2017.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE